**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**No. 3:20-CV-00528-RJC-DSC**

| | |
|---|---|
| Michael Johnson and Willard Turpin, individually and as representatives of a class of similarly situated persons, and on behalf of the Duke Energy Retirement Savings Plan, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) **AMENDED CLASS ACTION** <br>) **COMPLAINT** |
| v. | )<br>) |
| Duke Energy Corporation, Duke Energy Benefits Committee, and John and Jane Does 1-30, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

## NATURE OF THE ACTION

1. Plaintiffs Michael Johnson and Willard Turpin, individually and as representatives of a class of participants and beneficiaries of the Duke Energy Retirement Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), on behalf of the Plan against Defendants Duke Energy Corporation ("Duke Energy"), the Duke Energy Benefits Committee ("Committee"), and John and Jane Does 1-30. As set forth herein, Defendants have breached their fiduciary duties with respect to the Plan in violation of ERISA and to the detriment of the Plan and its participants and beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct and to obtain appropriate monetary and equitable relief as provided by ERISA.

2. "In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and

employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). The Department of Labor urges plan participants to scrutinize fees, cautioning that a "1 percent difference in fees and expenses [can] reduce your account balance at retirement by 28 percent." Department of Labor, Employee Benefits Security Administration, "A Look at 401(K) Plan Fees," September 2019, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.[1]

3.      Defendants have a fiduciary duty—the highest obligation under the law—to engage in prudent practices to monitor the Plan's expenses and ensure they are no more than necessary. Defendants have failed to do this with respect to the Plan's recordkeeping and managed account services. Instead, Defendants have allowed the Plan to pay roughly twice as much for the same services that other plans pay. As a result, the Plan (and its participants and beneficiaries) have suffered significant losses totaling millions of dollars. Given the exorbitant and excessive fees that Defendants have allowed the Plan to pay, it is reasonable to infer Defendants have failed to follow prudent practices and have thus failed to uphold their fiduciary duties.

4.      Based on the conduct described herein, Plaintiffs assert claims against Defendants under ERISA for breach of the fiduciary duty of prudence (Count One), and against Duke Energy for failure to monitor fiduciaries (Count Two). In connection with these claims, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches and other appropriate equitable relief.

---

[1] The United States Securities and Exchange Commission ("SEC") and others similarly warn that although the fees and costs associated with investment products and services may seem small, over time they can have a major impact on an investor's portfolio. *See* SEC Investor Bulletin, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), *available at* https://www.sec.gov/investor/alerts/ib_fees_expenses.pdf.

2

<u>**JURISDICTION AND VENUE**</u>

5.     **Jurisdiction:** Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109. Because this case concerns a federal question under ERISA, this Court has exclusive subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

6.     **Venue:** This district is the proper venue under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

<u>**THE PARTIES**</u>

**PLAINTIFFS**

7.     Plaintiff Michael Johnson ("Johnson) resides in Inverness, Florida, participated in the Plan beginning in 1997, and is a former participant in the Plan. As a participant, Johnson was enrolled in the Plan's managed account service. Johnson has suffered financial losses due to Defendants' failure to prudently manage the recordkeeping and managed account fees charged to participants.

8.     Plaintiff Willard Turpin ("Turpin") resides in Aurora, Indiana, has participated in the Plan since 1998, and is a current participant in the Plan. As a participant, Turpin was enrolled in the Plan's managed account service. Turpin has suffered financial losses due to Defendants' failure to prudently manage the recordkeeping and managed account fees charged to participants.

**THE PLAN**

9.     The Plan was established by Duke Energy Corporation on July 1, 1959.

3

10.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), covering all eligible current and former employees of Duke Energy and of its affiliated companies (collectively, "Participating Companies").

11.     The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan." The Plan is maintained pursuant to a written instrument called the "Plan Document." *See* 29 U.S.C. § 1102(a).

12.     The Plan is administered by the Duke Energy Benefits Committee. Fidelity Management Trust Company is the trustee.

13.     From the beginning of 2014 through the end of 2019, the Plan had between 33,000 and 39,000 participants, and between $6.7 and $9.2 billion in assets, making the Plan among the largest 0.01% of all defined contribution plans in the United States based on plan assets. Plans of this size are often referred to as "jumbo" or "mega" plans and have significant bargaining power to negotiate extraordinarily low fees for services, including managed account services.

14.     Plan participants may contribute a percentage of their earnings on a pre-tax basis to the Plan. Duke Energy generally matches a portion of the employee's contributions to their 401(k) account, typically between 4 and 6% of the employee's eligible compensation, depending upon their classification.[2]

---

[2] Employer contributions, along with the opportunity to participate in a defined contribution plan, are part of a standard benefits package offered by nearly all large employers to attract and retain talented employees. *See* 401(k) Specialist, *Top 4 Priorities of 401(k) Plan Sponsors* (Jan. 3, 2016), *available at* http://401kspecialistmag.com/top-4-priorities-of-401k-plan-sponsors (highlighting survey findings that, among large defined contribution plan sponsors, attracting and retaining talented employees is a top priority); Joan Vogel, *Until Death Do Us Part: Vesting of Retiree Insurance*, 9 Indus. Rel. L.J. 183, 216 (1987) (noting that employers offer retirement benefits to attract and retain "reliable, productive employees"). These employer contributions are made in a company's capacity as an employer, not a fiduciary. *See Brotherston v. Putnam Investments*, *LLC*,

4

15.     Plan participants may invest their monies in the investment options on the Plan's investment menu, which are selected by the fiduciaries of the Plan. They also have the option of investing up to 90% of their monies through a brokerage window, BrokerageLink, through which they may invest in numerous publicly-traded securities not offered on the Plan's investment menu.

16.     The Plan also offers a managed account service called Professional Management Program. The Professional Management Program is administered by Financial Engines Advisor, LLC, an independent investment advice and management services provider. For these services, participants are charged a flat percentage of their average account balance in addition to the fees associated with the selected investment.

### DEFENDANTS

#### *Duke Energy*

17.     Duke Energy is a corporation organized under Delaware law with its principal place of business in Charlotte, North Carolina.

18.     Duke Energy is an energy holding company, serving customers in six states: Ohio, Kentucky, Tennessee, Florida, North Carolina, and South Carolina. Through its subsidiaries, Duke Energy provides regulated utility services such as gas and electricity service and related infrastructure, as well as nonregulated utility services, such as wind and solar power. Duke Energy employs approximately 30,000 employees.

19.     Duke Energy is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B) and has ultimate decision-making authority with respect to the Plan and the management and administration of the Plan and its investments. Because Duke Energy exercises discretionary

---

907 F.3d 17, 28–29 (1st Cir. 2018) ("In making discretionary contributions, it acted as employer providing compensation to its employees, not as fiduciary."). ERISA is concerned with what happens next: the disposition of assets contributed.

5

authority or control with respect to management and administration of the Plan and disposition of Plan assets, it is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

20.     To the extent that Duke Energy has delegated any of its fiduciary functions to others, such as the Duke Energy Benefits Committee, it still maintained fiduciary responsibilities with respect to the Plan. The authority to appoint, retain, and remove other plan fiduciaries constitutes discretionary authority or control over the management or administration of the Plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("[T]he power … to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)."). Further, the responsibility of appointing and removing other fiduciaries comes with an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Coyne*, 98 F.3d at 1465 (The power to appoint and remove plan fiduciaries "carries with it a duty to monitor appropriately those subject to removal." (quotation omitted)).

21.     Any individuals or entities not named in this Complaint to whom Duke Energy delegated fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because these individuals or entities are not currently known to Plaintiffs, they are collectively referenced in this Complaint as John and Jane Does 1-10.

### *Duke Energy Benefits Committee*

22.     The Duke Energy Benefits Committee is a committee designated to assist Duke Energy with administration of the Plan. The Committee has the duty to select, monitor, evaluate, and modify the Plan's investments, subject to the ultimate oversight and discretion of Duke

6

Energy. The Committee is also responsible for hiring and monitoring all service providers hired to perform services for the Plan, including the Plan's recordkeeper and managed account provider. In performance of its duties, the Committee exercises "authority or control respecting management or disposition of the Plan's assets" and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

23.     Each of the Committee members is also a fiduciary under 29 U.S.C. § 1002(21)(A). As the names of the Committee members during the class period[3] are currently unknown to Plaintiffs, they are collectively referenced in this Complaint as John and Jane Does 11-30.

24.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES

25.     ERISA imposes strict fiduciary duties upon fiduciaries of retirement plans. These fiduciary duties are "the highest known to law." *Tatum v. RJR Pens. Invest. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (citation and quotation marks omitted). Among other things, the statute provides:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

---

[3] The class period is limited to the period on or after September 23, 2014, *see infra* ¶ 62, pursuant to ERISA's six-year statute of limitations, *see* 29 U.S.C. § 1113(1).

7

29 U.S.C. § 1104(a)(1)(B). This is commonly referred to as the "duty of prudence."

26. A fiduciary's conduct "must bear the marks of loyalty, skill, and diligence expected of an expert in the field." *Sweda v. Univ. of Penn.*, 923 F.3d 320, 329 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) (quotation omitted). "It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. A pure heart and an empty head are not enough." *Id.*

27. Integral to the duty of prudence is the duty to minimize costs. At retirement, employees' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328 (quotation omitted). Failing to closely monitor and minimize administrative expenses (by, for example, failing to survey the competitive landscape and failing to leverage the plan's size to reduce fees), constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

28. To protect retirement plan participants, ERISA requires the fiduciaries of such plans to monitor expenses and ensure that they are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties … solely in the interest of participants … for the exclusive purpose of[] providing benefits … and defraying reasonable expenses of administering the plan[.]"); *Sweda*, 923 F.3d 3at 328 ("Fiduciaries must … understand and monitor plan expenses."). Given the significant variation in total plan costs attributable to plan size, the reasonableness of expenses charged to a plan should be determined by comparisons to other similarly sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge

8

their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character"); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (plaintiffs sufficiently alleged that expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties.") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

29. A fiduciary may breach its fiduciary duty by authorizing higher-than-appropriate fees. *See Tussey v. ABB, Inc.*, 746 F.3d at 336 (affirming judgment against plan sponsor based on "overpaying" recordkeeper); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

## BACKGROUND ON DEFINED CONTRIBUTION PLANS AND SERVICE PROVIDER INDUSTRY

30. As of March 31, 2020, Americans held approximately $7.9 trillion in employer-based defined contribution retirement plans, such as 401(k) and 403(b) plans. *See* Investment Company Institute, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020), *available at* https://www.ici.org/research/stats/retirement/ret_20_q1. Defined contribution plans have largely replaced defined benefit plans (commonly known as pension plans) that were predominant in previous generations. *See* Bankrate, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), *available at* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx.[4]

---

[4] One significant difference between a defined benefit plan and a defined contribution plan is who bears the costs and investment risks associated with plan. In a defined benefit plan, the participants receive a fixed benefit amount that will not change depending on how the plan is managed. *See*

31.     The rapid growth in the number and size of defined contribution plans has yielded a concomitant explosion in the industry of service providers to defined contribution plans. Investment managers, recordkeepers, managed account service providers, and consultants are constantly creating new products and services to offer plan sponsors. The duty of prudence requires that plan fiduciaries remain vigilant, conduct thorough due diligence, and ensure that only those services that serve participants' best interests are paid for out of plan assets and that the fees charged for those services are minimized.

32.     The two largest categories of fees charged to plan participants are investment manager fees and recordkeeping expenses. Managed account service fees have also emerged as a growing category of fees. The market for these three service providers is large and competitive.

33.     Multi-billion-dollar plans with tens of thousands of participants, like the Plan, enjoy significant bargaining power and are able to extract competitive rates for high quality services from these service providers. It is therefore particularly incumbent upon fiduciaries of large plans to be diligent and ensure that they are obtaining the best rates available for these services.

## DEFENDANTS' FIDUCIARY BREACH

I.     **DEFENDANTS FAILED TO PROPERLY MONITOR OR CONTROL THE PLAN'S RECORDKEEPING EXPENSES.**

34.     Defendants caused Plan participants to pay excessive recordkeeping expenses during the class period.[5]

_Thole v. U.S. Bank, N.A._, 140 S. Ct. 1615, 1620 (2020). By contrast, with a defined contribution plan, "every penny of gain or loss" affects beneficiaries. Thus, management of defined contribution plan expenses has a direct impact on participants' retirement security.

[5] Recordkeeping services is a catch-all term for a number of administrative services generally provided by a single entity to a defined contribution plan including hosting a website for participants, processing contributions, processing distributions, disseminating information to participants, preparing quarterly statements, and other services. Recordkeeping is generally one of the largest expenses for a defined contribution plan.

35. Typically, recordkeeping services are charged on either a per-participant fee basis (a fee based on the number of participants in the plan) or as an asset-based fee (a fee based on a percentage of the total assets in the plan). Asset-based fee arrangements are more common for smaller defined contribution plans, which have less leverage to negotiate how services are charged. Although both practices are acceptable, plan fiduciaries must ensure that the plan pays no more than is necessary for the services provided.

36. Among mega plans like the Plan, the market for recordkeeping services is highly competitive, with many vendors equally capable of providing a high-level service. Accordingly, vendors vigorously compete for business by offering the best price. As a result of such competition, recordkeeping fees have declined in defined contribution plans over time. Between 2006 and 2016, recordkeeping costs in the marketplace have dropped by approximately 50% on a per-participant basis.[6]

37. The cost of providing administrative services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating lower per-participant administrative fees. As noted above, the Plan has had between 33,000 and 39,000 participants, and between $6.7 and $8.6 billion in assets during the class period, making it one of the 100 largest defined contribution plans in the United States (out of more than 650,000). Accordingly, the Plan has significant leverage to negotiate administrative expenses.

38. Further, recordkeeping expenses are not affected by the size of a participant's account. It costs the same to recordkeep an account with $500 as it does to recordkeep an account

---

[6] See Greg Iacurci, *Adjusting to the Squeeze of Fee Compression*, Investment News (Nov. 9, 2019) *available at* https://www.investmentnews.com/adjusting-to-the-squeeze-of-fee-compression-170635 ("Median fees for record-keeping, trust and custody services for DC plans fell by about half in the decade through 2017, according to most recent figures published by consulting firm NEPC.").

with $1 million. Therefore, regardless of *how* recordkeeping is paid, the best way to analyze whether a particular plan's recordkeeping expenses are excessive is to compare the amount paid on a per-participant basis to the amounts paid by similarly sized plans in the marketplace.

39.     Fidelity has been the Plan's recordkeeper since at least 2009.[7]

40.     The Plan's Form 5500s for 2014 through 2018 show that Fidelity's direct compensation for recordkeeping services to the Plan has been between $58 and $67[8] per participant during the class period. Despite the Plan's substantial bargaining power, this rate is far higher than the rates secured throughout the statutory period by smaller plans with less bargaining power.

| | Fee Per-Participant | Number of Participants | Recordkeeper |
|---|---|---|---|
| ***Duke Energy Ret. Savings Plan (2014-2018)*** | $58-$67 | 33,000-39,000 | Fidelity |
| Deutsche Bank Matched Savings Plan (2014) | $45[9] | 20,715[10] | Fidelity |
| 401(k) Savings and Profit Sharing Plan for Employees of Nike, Inc. (2014-2016) | $29 (2014) $21 (2016) | 22,662 (2014) 26,568 (2016) | Alight[11] |
| New Albertson's Inc., 401(k) Plan (2016) | $31[12] | 30,702 | Vanguard |
| M&T Bank Corporation Retirement Savings Plan (2016) | $40[13] | 20,549 | T. Rowe Price |

---

[7] As noted above, Fidelity's recordkeeping expenses for the Plan are paid for by participants and beneficiaries. Fidelity may provide other services to Duke Energy in connection with its other benefits plans, but those expenses would be paid for by Duke Energy.

[8] This represents only the amount of direct compensation Fidelity received. Fidelity also received an undisclosed amount of indirect compensation from the Plan throughout the statutory period. Accordingly, the Plan likely paid Fidelity more than the $58-$67 that Fidelity received directly.

[9] *See Trial Declaration of Martin Schmidt, Moreno v. Deutsche Bank Americas Holding Corp.*, No. 1:15-cv-09936, ECF No. 311 at ¶ 87 (S.D.N.Y. July 3, 2018).

[10] The number of participants for other plans is taken from publicly available Form 5500s.

[11] Alight was formerly known as Hewitt Associates.

[12] *See Cates v. Tr. of Columbia Univ.*, No. 1:16- cv-06524, ECF No. 292-6 at 1 (S.D.N.Y. July 1, 2019).

[13] *See In re M&T Bank Corp. ERISA Litig.*, No. 1:16-cv-00375, ECF No. 94 at 15 n.15 (W.D.N.Y. Mar. 25, 2019).

41.     The Plan had anywhere from 5,000-15,000 more participants than these plans, yet paid up to three times as much for comparable recordkeeping services. Further demonstrating the imprudence of the Plan's fiduciaries, the Plan's Form 5500s show that Duke Energy has used the same recordkeeper for at least the past decade, and that the recordkeeping rates paid by Plan participants stayed roughly the same between 2014 and 2018, while marketplace rates dropped.[14]

42.     Based on the lower rates secured by smaller plans, it is clear that the $58-$67 paid by Plan participants was excessive. Indeed, recent public filings from both Fidelity and the Plan itself show that the Plan could have obtained comparable recordkeeping services of like quality for less than half the cost that was paid. Fidelity recently stipulated in a separate action involving its own plan that it was offering recordkeeping services to other large plans for as little as $14-21 per participant as early as 2014, and that the services provided were comparable among plans with over $1 billion in assets that were recordkept by Fidelity. *See Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 214 (D. Mass. 2020). As one of the 100 largest defined contribution plans in the country with over $6 billion in assets, the Plan could have secured favorable rates from Fidelity at the beginning of the statutory period had Defendants monitored the Plan's recordkeeping fees. Further, the Plan's Form 5500s for 2019[15] indicate that Fidelity's direct compensation for recordkeeping services to the Plan fell by nearly two-thirds, to around $21 per participant, in 2019.

43.     It should not have taken Defendants five years to obtain a reasonable recordkeeping rate. A prudent fiduciary would have closely monitored the Plan's administrative expenses at the beginning of the statutory period and engaged in a rigorous benchmarking analysis, either on its

---

[14] An increase of 5,000 participants should warrant a significant fee reduction. For example, the fiduciaries of the Nike 401(k) plan secured a fee reduction of $8 per participant upon adding less than 4,000 participants from 2014 to 2016.

[15] The Plan's Form 5500s for 2019 were filed on October 14, 2020.

own or by working with an independent consultant, and would have discovered that the Plan was paying far too much for recordkeeping. Alternatively, the Plan could have performed a request for proposal ("RFP") at the beginning of the statutory period and discovered that other service providers would have provided the same services at lower cost. Had Defendants not waited to act, these savings could have been realized through a much lower per-participant monthly charge. This gives rise to an inference that Defendants failed to monitor recordkeeping compensation during that period, and failed to solicit competitive bids from other recordkeepers that would have resulted either in retention of a new recordkeeper or a significant reduction in the rates paid to its existing recordkeeper.

44. By charging participants excessive recordkeeping expenses for at least five years, Defendants have demonstrated that they failed to engage in prudent monitoring of the Plan's recordkeeping expenses and engage in prudent practices to keep those costs at competitive levels throughout the statutory period. Whatever the cause of this failure, the process by which Defendants managed the Plan's recordkeeping services and fees "would have been tainted by failure of effort, competence, or loyalty," each of which constitutes a "breach of fiduciary duty." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). Defendants' failure to monitor or control the Plan's recordkeeping expenses cost Plan participants millions of dollars during the class period.

## II. DEFENDANTS FAILED TO MONITOR OR CONTROL THE PLAN'S MANAGED ACCOUNT FEES.

45. Defendants also caused Plan participants to pay excessive managed account service fees during the class period. A managed account is an investment service under which a participant pays a fee to have a managed account provider invest his or her account in a portfolio of preselected investment options. Managed account providers "generally offer the same basic service—initial

14

and ongoing investment management of a 401(k) plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), *available at* https://www.gao.gov/assets/670/664391.pdf. Assets are generally managed based upon a program designed by the managed account provider that customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

46.     Participants who sign up for managed account services are generally charged an annual fee as a percentage of the participant's account balance. Typically, though not always, pricing is tiered. For example, the first $50,000 of assets may be charged a certain fee level, the next $150,000 in assets at a lower level, and all remaining assets at a still lower level.

47.     Participants have no control over the rate they are charged—fee levels are determined at the plan level through a contractual agreement between the managed account provider and the fiduciaries of the plan. When managed account services were first introduced roughly 25 years ago, these fees were generally fixed by either the managed account provider or the recordkeeper, leaving little or no room for negotiation. However, for at least the past decade, larger plans have been able to negotiate multiple facets of the fees charged by managed account providers. This includes both the asset levels at which particular tiers start (*i.e.*, the highest tier applies to the first $25,000 versus the first $100,000) as well as the percentage charged at each fee level.

48.     As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds. But, in recent years, a number of managed

15

account service providers such as Fidelity, Morningstar, Financial Engines, and Great-West have emerged that are capable of providing a high level of managed account services at competitive rates. As this industry segment has matured over the past decade, expenses have declined and competition has increased. As a result, fees for managed account services have been declining for a number of years.

49.     As with recordkeeping services, prudent fiduciaries will regularly monitor the amount of managed account service fees the plan is paying and will conduct periodic cost benchmarking to determine whether those amounts are consistent with the amounts paid by other similarly-situated plans. As with recordkeeping, if the benchmarking analysis demonstrates that the plan is paying higher fees than other similarly-situated plans, a prudent fiduciary will solicit bids from other managed account service providers.

50.     Since at least 2010, Defendants have retained Financial Engines—one of the largest managed account service providers in the industry—to provide such services to the Plan.

51.     For this service, Defendants allowed participants to pay an annual fee—0.50% of their average account balance for the year—regardless of the size of their account. In doing so, Defendants caused the Plan to pay significantly more for managed account services than other plans pay for identical services. Defendants also failed to capture tiered pricing for participants with larger account balances, which is industry standard for managed account services.

52.     For example, nearly five years ago, participants in the Citi Retirement Savings Plan—a plan with similar managed account usage to the Plan—paid between 30 to 50 percent less for Financial Engines' managed account service: 0.35% of the balance per year for the first $100,000 in a participant's account, 0.30% of the balance per year for the next $150,000 in a participant's account, and 0.25% of the balance per year for all other money in the participant's

account.[16] Participants in several other retirement plans paid similar rates as the Citi Retirement Savings Plan for Financial Engines' managed account service. Had Defendants paid closer attention to managed account fees, they could have similarly negotiated lower rates for Financial Engines' managed account service.

53.     Fees have continued to shrink in the past five years. As of 2019, participants in Comcast's 401(k) plan—another plan with similar managed account usage to the Plan—pay no fees on their first $25,000, 0.30% on the next $225,000, and 0.20% on the balance.

54.     These examples are not anomalous. Other plans that use Financial Engines and have similar managed account usage have negotiated far lower rates than Defendants negotiated for the Plan. Though companies are not required to report the fee rates for managed account services, making it difficult to obtain marketplace data, the below chart shows the rates paid by the comparators identified above along with other plans for which Plaintiffs were able to obtain data:

|  | Fee on 1st Tier | Fee on 2d Tier | Fee on 3d Tier |
|---|---|---|---|
| *Duke Energy Ret. Savings Plan (2015)* | *0.50%* | *0.50%* | *0.50%* |
| **AGFA Healthcare Corp. Employee Savings Plan (2018)** | 0.40% | 0.30% | 0.20%[17] |
| **Caterpillar Sponsored 401(k) Plans (2016)[18]** | 0.40% | 0.30% | 0.20% |
| **Citi Ret. Savings Plan (2015)** | 0.35% | 0.30% | 0.25% |
| **JC Penney 401(k) Savings Plan (2015)** | 0.35% | 0.25% | 0.10% |
| **Comcast Corp. Ret. Investment Plan (2019)** | 0.00% | 0.30% | 0.20% |

---

[16] These managed account service fees were made on the Citi Retirement Savings Plan – Annual Fee Disclosure Statement as of December 31, 2015.

[17] The AGFA Healthcare Corp. Employee Savings Plan has a fourth tier of rates—0.10% for amounts over $500,000 in a participant's account.

[18] These rates apply to five Caterpillar sponsored 401(k) plans: the Caterpillar 401(k) Retirement Plan, 401(k) Savings Plan, Tax Deferred Retirement Plan, Solar Savings Investment Plan, and Global Mining Legacy Hourly Employees' Savings Plan.

55.     Although the figures above may appear small on a percentage basis, the impact of these excessive managed account fees on a participant's retirement savings is significant.[19] A Plan participant with $400,000 in his retirement account pays $2,000 per year in managed account fees, while a participant in the Citi Retirement Savings Plan only pays $1,175 for the same managed account service.[20] In just five years (assuming 8% annual returns), the Plan participant's account will be worth $5,139 less than the Citi plan participant due to excess fees and lost earnings. This disparity will continue to grow over time, to the significant financial detriment of participants in the Plan's managed account service. For illustrative purposes, over twenty years, that disparity increases to $40,084.

56.     Given the significant negotiating power of the Plan, Defendants should have negotiated lower managed account fees consistent with the other plans referenced above. Instead, participants in the managed account program collectively paid millions of dollars in unnecessary fees because Defendants failed to prudently manage the Plan's managed account services program.

57.     A prudent fiduciary would have conducted periodic cost benchmarking and taken other measures (including issuing an RFP, if necessary) to ensure that the amounts paid by the Plan for managed account services were reasonable. Had Defendants done so, the Plan would not have paid the excessive managed account service fees that it did. Based on the excessive amounts paid by the Plan for managed account services, it is reasonable to infer that Defendants failed to

---

[19] If anything, the chart understates the impact on Plan participants. Four of the five plans listed, the AFGA, Caterpillar, Citi, and JC Penney plans, subcontracted with Financial Engines through the plan's recordkeeper. A subcontracting arrangement should yield higher fees because it involves both the vendor (Financial Engines) and the middle-man (the recordkeeper). Here, the Plan contracted directly with Financial Engines. Defendants should have been able to secure an even lower rate than the plans that subcontracted with Financial Engines by cutting out the middle-man.
[20] This assumes that the managed account fees charged to Citi participants have not decreased since December 31, 2015, the latest date for which Plaintiffs have data regarding the level of these fees.

prudently manage the Plan's managed account services. Defendants' failure to properly monitor or control fees for the Plan's managed account service cost Plan participants millions of dollars during the class period, and constitutes a separate and independent breach of fiduciary duty.

58. Indeed, it appears that around 2019 Defendants finally recognized the excessive fees they were causing Plan participants to pay for managed account services and renegotiated the Plan's managed account service fees. In 2019, Plan participants paid 33 basis points on all assets for managed account services. While this is an improvement over 50 basis points, it is still excessive given the industry trends for managed account services and the enormous leverage the Plan enjoys in the marketplace. Even under this new fee structure, participants in the Duke Energy plan continue to pay 20 to 50 percent higher fees than participants in the Comcast 401(k) plan.

## III. PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND OTHER MATERIAL FACTS.

59. Plaintiffs did not have knowledge of all material facts (including, among other things, the cost of the Plan's recordkeeping services compared to similarly-sized plans, the Plan's leverage to negotiate lower recordkeeping expenses, the cost of the Plan's managed account service compared to similarly-sized plans, and the Plan's leverage to negotiate managed account expenses) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.

60. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting and monitoring the Plan's recordkeeper and managed account service provider) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

61.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

62.     Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:[21]

> All participants and beneficiaries of the Duke Energy Retirement Savings Plan at any time on or after September 23, 2014, excluding any persons with responsibility for the Plan's investment or administrative functions.

63.     Numerosity:    The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 33,000-39,000 participants at all relevant times during the applicable period.

64.     Typicality:    Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' unlawful actions and decisions affected all Plan participants similarly.

65.     Adequacy:    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

---

[21] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

66.     Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

  a.   Whether Defendants are fiduciaries with respect to the Plan;

  b.   Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

  c.   The proper form of equitable and injunctive relief; and

  d.   The proper measure of monetary relief.

67.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

68.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

69.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest

in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duty of Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)
### (against all Defendants)

70. As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

71. 29 U.S.C. § 1104 imposes the fiduciary duty of prudence upon Defendants in connection with their administration of the Plan and the selection and monitoring of Plan service providers and the fees charged by such service providers. The scope of this fiduciary duty includes defraying *reasonable* expenses of administering the Plan, and acting with appropriate care, skill, diligence, and prudence. *See* 29 U.S.C. § 1104.

72. Defendants breached their fiduciary duties by engaging in the conduct described herein. Among other things, Defendants imprudently caused the Plan to pay excessive recordkeeping fees, caused the Plan to pay excessive managed account fees, and failed to properly monitor and control those expenses. Each of the actions and omissions described above and elsewhere in this Complaint demonstrate that Defendants failed to defray reasonable expenses of the Plan, and with the care, skill, prudence, and diligence under the circumstances then prevailing

that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A)–(B).

73.     As a consequence of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in excess fees.

74.     Defendants are liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from Defendants' fiduciary breaches. In addition, Defendants are liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## COUNT II
### Failure to Monitor Fiduciaries (against Duke Energy)

75.     As alleged throughout the Complaint, Duke Energy is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21).

76.     Duke Energy is responsible for appointing and removing the Committee members.

77.     Given that Duke Energy had overall oversight responsibility for the Plan, and the fiduciary duty to appoint and remove members of the Committee, Duke Energy had a fiduciary responsibility to monitor the performance of the Committee.

78.     A monitoring fiduciary must ensure that the monitored fiduciaries are appropriately performing their fiduciary obligations, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations under ERISA.

79.     Duke Energy breached its fiduciary monitoring duties by, among other things:

    a.  Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b. Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

c. Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly recordkeeping and managed account services, to the detriment of the Plan and Plan participants' retirement savings.

80.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses due to excessive fees.

81.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Duke Energy is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor the Plan's fiduciaries, and subsequent failure to take prompt and effective action to rectify the fiduciary breaches described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A declaration that Defendants have breached their fiduciary duties as described in the Complaint;

D.     An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.     An Order enjoining Defendants from any further violations of ERISA;

F.     Other equitable relief to redress Defendants' illegal practices and to enforce provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to review or manage the Plan and removal of or replacement of Plan fiduciaries deemed to have breached their fiduciary duties;

G.    An award of pre-judgment interest;

H.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

I.    An award of such other and further relief as the Court deems equitable and just.

Dated: November 23, 2020                    **NICHOLS KASTER, PLLP**

                                            /s/ Kai H. Richter
                                            Paul J. Lukas, MN Bar No. 22084X*
                                            Kai H. Richter, MN Bar No. 0296545*
                                            Brock J. Specht, MN Bar No. 0388343*
                                            Ben Bauer, MN Bar No. 0398853*
                                            *admitted pro hac vice
                                            4700 IDS Center
                                            80 S 8th Street
                                            Minneapolis, MN 55402
                                            Telephone: 612-256-3200
                                            Facsimile: 612-338-4878
                                            lukas@nka.com
                                            krichter@nka.com
                                            bspecht@nka.com
                                            bbauer@nka.com

                                            **THARRINGTON SMITH, L.L.P.**
                                            F. Hill Allen
                                            North Carolina State Bar No. 18884
                                            P.O. Box 1151
                                            Raleigh, NC 27602-1151
                                            Telephone: 919-821-4711
                                            Facsimile: 919-829-1583
                                            E-mail: hallen@tharringtonsmith.com

                                            **LEVIN LAW FIRM, PLLC**
                                            Doron Levin*
                                            *admitted pro hac vice
                                            2000 West Loop South, Suite 2200
                                            Houston, Texas 77027
                                            Phone:  1(800) 932-2694
                                            levin@law29.com

                                            *Attorneys for Plaintiffs*

25